THE CORNER d/b/a The Other Corner, Appellant (Defendant)

v.

PINNACLE, INC., d/b/a Games Plus, Appellee (Plaintiff).

No. 95–11.

Supreme Court of Wyoming.

Nov. 21, 1995.

Bernard E. Cole and Donald A. Cole of Cole & Cole Law Firm, Cheyenne, for appellant.

Douglas G. Madison and Brandin Hay of Dray, Madison & Thomson, P.C., Cheyenne, for appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR, and LEHMAN, JJ.

THOMAS, Justice.

The sole issue in this case is the proper method of computing damages for the breach of a contract to lease coin-operated machines. The Corner, Inc. d/b/a The Other Corner (The Corner) leased a jukebox, a pool table, an electronic dartboard, and two vending machines from Pinnacle, Inc. d/b/a Games Plus (Pinnacle) but, within a few days, The Corner repudiated the lease agreement. The breach of the lease agreement was conceded, and the sole issue at trial was the proper amount of damages. The Corner asserts that damages were awarded under a provision of the lease providing for gross profit as liquidated damages, which is an inappropriate way of arriving at damages. Pinnacle contends the damages were properly computed by arriving at net profits through a formula that reduced the payments due under the lease by expenses the lessee would have incurred had the contract been performed. With one exception, we hold the trial court properly computed the damages in this case, and the damages are supported by sufficient evidence. The judgment entered by the trial court is remanded for the entry of a judgment in the correct amount.

The Corner asserts the following issues in its Brief of the Appellant:

Whether the liquidated damages clause as stated in the contract between the parties is enforceable or whether it is void as a penalty and not reflective of appellee's actual damages?

What are the damages as set forth under the Uniform Commercial Code?

The Brief of Appellee Pinnacle, Inc. sets forth a single issue:

Did the District Court correctly determine the damages Pinnacle, Inc. sustained as a result of The Corner's breach of its Personal Property Lease Agreement?

The Corner's business is a cocktail lounge and a package liquor store in which entertainment is provided for patrons in the form of music and games. Pinnacle's business is providing coin-operated vending machines to businesses like The Corner. On September 9, 1993, The Corner and Pinnacle executed a contract (Agreement) pursuant to which Pinnacle leased to The Corner a compact disc jukebox, a pool table, an electronic dartboard, a new cigarette/candy vending machine, and one used cigarette vending machine. The term of the Agreement was three years and gave Pinnacle "the exclusive right to maintain and operate coin-operated equipment" at The Corner. The Agreement was to become effective upon installation of the equipment which, subject to availability, was to be installed no later than fourteen days after the Agreement was signed.

The consideration for the jukebox furnished by Pinnacle was $65 per week. The consideration for the pool table was a down payment of $400 and a payment of $250 per month to Pinnacle for twelve months. It then provided that The Corner would have the option of purchasing the pool table for $1 after the first twelve months of the lease, and then would pay $75 per month for a "Maintenance, League Service agreement" with Pinnacle. The consideration for the dartboard was an equal division of the proceeds, and for the cigarette machines the consideration provided for ten percent of the gross income to The Corner with the balance to Pinnacle.

The provision with respect to damages reads:

6. If the Location [The Corner] shall breach any provision of this Agreement, the Operator [Pinnacle] shall be entitled to recover as damages, all of the profits which it would otherwise have earned during the term remaining as of the breach of this Agreement. Those future gross profits shall then become immediately due and payable by the Location. The Operator's expenses are fixed and its damages shall not be reduced by its expenses, or any part thereof, or by any amounts that it may earn from other locations. In calculating the loss of profits, it shall be assumed that the average weekly profits earned by the Operator prior to the breach would have continued during the remaining term of the Agreement. However, the loss of profits shall not be less than the minimum weekly commission provided for herein, if such has been stated in paragraph 2. If legal action shall be instituted by either party to enforce the terms or conditions contained herein, then the prevailing party in any such action shall be entitled to recover from the other the reasonable attorneys fees and costs incurred.

On September 13, 1993, The Corner advised Pinnacle it did not intend to continue with the Agreement. The principals met on September 14, 1993 to discuss this repudiation but, later that day, The Corner advised Pinnacle it intended to persist in its repudiation. Pinnacle was able to place the dartboard in another location, but was unsuccessful in finding locations for any of the other equipment. Some three months later, Pinnacle brought this action against The Corner in which it alleged breach of contract and damages under paragraph six of the Agreement for lost profits, reasonable attorney fees and costs, all consequential damages, and other relief the court might deem proper. The Corner admitted breach of the contract and contested only damages.

At trial, Pinnacle produced evidence to the effect it had ordered new equipment consisting of the compact disc jukebox, the pool table, an electronic dartboard, and a cigarette machine, and that it planned to install a second cigarette machine it already owned. Pinnacle's evidence included separate state-

ments of its potential revenues and the expenses it would have incurred during the term of the lease with respect to each machine. It relied upon the lease provisions for the consideration for the jukebox and the pool table and, with respect to the dartboard and the cigarette vending machines, it based its damages upon the records from The Corner showing the revenue from such devices for the prior year. Pinnacle's evidence of damages was summarized in its Exhibit C, which is attached as the Appendix to this opinion. While Pinnacle deducted the imputed direct expenses relating to the leased equipment, it did not deduct any of its overhead expenses.

At trial, The Corner elicited testimony with respect to certain aspects of Pinnacle's costs and the mitigation of its damages. Pinnacle did return the pool table and the jukebox to its supplier, but it was assessed a restocking fee of $650. Pinnacle did not have to pay the $1,850 price of the pool table nor the $4,500 price of the jukebox. It did place the electronic dartboard, costing $1,850, at a different location. Pinnacle canceled the order for the new cigarette machine prior to shipment, and it incurred no costs with respect to that machine. The Corner presented no evidence about revenues and expenses, but it did assert the damages claimed were unfair and unreasonable.

Pinnacle presented evidence of attorney fees in the amount of $2,401.73. The court reduced that amount by eliminating five charges, which it determined were unrelated to the dispute. Ultimately, it awarded attorney fees of $1,476.71. In the judgment, the trial court reduced the computed damages from $19,786.45 to its present value and added attorney fees for a total judgment in favor of Pinnacle in the amount of $18,861.43. The Corner appeals from that judgment.

In its brief, The Corner attacked paragraph six of the Agreement, which provided for liquidated damages but, at argument, it conceded this paragraph was not used to determine damages. It abandoned its argument that the Agreement provision "that all expenses are fixed and that damages shall not be reduced by expenses, or any part

thereof * * * is absolutely false and so outrageous, that the Appellee ignored its own contract * * *." Pinnacle contends it did not seek any liquidated damages from The Corner, and paragraph six has significance only to establish its right to attorney fees.

■ The essential premise for the argument The Corner presents is the usual rule that the remedy for breach of contract is the award of damages sufficient to place the plaintiff in the same position as he would have attained had the contract been fully performed, less any proper deductions. *BHP Petroleum Co., Inc. v. Okie,* 836 P.2d 873 (Wyo.1992). This concept of damages is incorporated in Wyoming's Uniform Commercial Code (U.C.C.) Wyo.Stat. §§ 34.1–1–101 to –10–104 (1991). Section 34.1–2.A–528(b), relating to leases, specifically provides that damages should "put a lessor in as good a position as performance would have." The Corner's contention is that Pinnacle is placed in a better position than it would have attained had the Agreement been performed because Pinnacle was allowed to recover costs and expenses it did not incur. The Corner contends that, in effect, it was penalized because it repudiated the Agreement.

In its complaint, Pinnacle did pray for damages calculated under paragraph six of the Agreement, but the testimony at trial and Exhibit C did not follow that approach. When the provision in the Agreement that damages shall not be reduced by expenses is compared with the testimony and exhibits pertaining to the calculation of damages, it is clear Pinnacle did reduce its profit calculations by the expenses it did not incur because of The Corner's breach, with one exception. Pinnacle invoked the Agreement to provide the lease consideration for the jukebox, the pool table, and the preventive maintenance and league costs "as outlined in the contract." In its Exhibit C, it deducted expenses for each of the five machines. Counsel clearly stated at trial that Pinnacle did not rely on paragraph six for damage calculations, but argues it calculated damages in accordance with paragraph two of the Agreement.[1] In light of these disparate positions

---

1. Paragraph 2 of the Agreement reads, in pertinent part:

and the concession by Pinnacle, we hold that there was no request for, nor did the trial court award liquidated damages under paragraph six. Pinnacle reduced its damages by its expenses, and The Corner did not suffer any penalty because of the application of paragraph six.

The next contention by The Corner deserves closer scrutiny. Its position is that the damages awarded did not reflect Pinnacle's true losses because Pinnacle calculated depreciation for the jukebox and the pool table for the three-year period of the Agreement. The Corner contends Pinnacle should have deducted the cost of the jukebox and pool table as expenses because those machines were returned to their supplier, and Pinnacle was credited with that amount less the restocking fee. Because of the manner in which the damages for the pool table were calculated, we hold that Pinnacle should have deducted the cost of the pool table rather than depreciation, but we sustain the trial court's judgment in all other respects.

■ The U.C.C. is "in large part a reformulation and restatement of the law merchant * * *." *Park County Implement Co. v. Craig,* 397 P.2d 800, 802 (Wyo.1964). In *Locks v. Wade,* 36 N.J.Super. 128, 114 A.2d 875, 877 (1955) (citations omitted), the court applied the law merchant to the calculation of damages in an action for breach of the lease agreement for an automatic phonograph, and it said:

> 2. The proceeds derived from the machines placed at the business establishment shall be divided hereto as follows:
>
> **Jukebox:** Lease with option to renew. Payment of $~~75.00~~ $65.00 per week to Operator. Location shall receive all cash proceeds from the jukebox. Lease to take effect __/__/93. Operator shall maintain, subject to normal wear and tear. Maintenance shall include license fees, parts, labor, travel. Operator shall also provide all CD's. Operator will install 2 additional CD's monthly for rotation. Location shall have option of getting new jukebox after 36 monthly payments, providing all payments are current, and at the prevailing rate of lease at that time for new equiment [sic]. * * *.
>
> **Pool Tables** (1): Lease with option to purchase. Down payment of $400.00 required per table. Payment of $250.00 per month to Operator for 12 months. Location shall receive all cash proceeds from the pool tables.

An illustration with figures may make this more graphic. If the agreed rental under the lease amounts to $2,040, the cost of installation and of furnishing records and parts to $500, and the depreciation on the jukebox over the period of the lease to $700, the lessor stands to make $840 on the deal. If another customer presents himself, the lessor will buy another jukebox, which he is entitled to enter on his books at cost and depreciate in the same way as he does with the first. Thus, if he makes the same agreement with the second customer, he will make another $840 on the second lease. If the first lessee repudiates his agreement, the purchase of an additional machine will of course, be unnecessary, because the first machine can be leased to the second customer. In such a situation, under defendant's theory, the lessor would receive as damages for this repudiation only the $2,040 rental agreed on under the first lease, less the $2,040 rental for the same machine under the second lease, or nothing. This would leave the lessee only the $840 profit he will make under the second lease; whereas had the first lessee lived up to his bargain the lessor's profits would have been $840 on each of two leases, or $1,680.

We conclude that the proper measure of damages here is the difference between the contract price and the cost of performing the first contract, as the court appar-

> Lease begins on day of installation (__/__/93). Lease shall include all maintenance and supplies necessary to keep the tables in good repair. * * * Location will have the option of purchasing the table/s at the completion of first twelve (12) months lease for $1.00 per table, provided the Location also agrees to an additional two year Maintenance, League Service agreement with Games Plus. This agreement shall cost $75.00 per month for the 24 months of the agreement. This agreement shall include all supplies, labor, parts necessary to conduct pool leagues at Location. * * *.
>
> **Amusement:** This classification shall include pinballs, videos, electronic darts, and any other games or machines that provide amusement only. Location _50_%; Operator _50_%. * * *.
>
> * * * * * *
>
> **Vending Machines:** Commission to Location in the sum of _10%_ of gross income; balance to Operator. * * *.

ently held below. In the case of realty which (unlike the jukebox) is specific and not to be duplicated on the market, the lessor could not properly lease it to another for the same period unless the first lease were broken or terminated. In such a case the lessor should not be awarded two profits merely because of the first lessee's default.

So in general we may say that gains made by a lessor on a lease entered into after the breach are not to be deducted from his damages unless the breach enabled him to make the gains. The recoverable damages in the case of a contract are such as may reasonably be within the contemplation of the parties at the time of the contract * * *; and with that in view, we should not in the present case deny lessor the benefit of his bargain.

*See also Seaboard Music Co. v. Germano,* 24 Cal.App.3d 618, 101 Cal.Rptr. 255 (1972); *Weiman v. Butterman,* 124 Ill.App.2d 246, 260 N.E.2d 321 (1970); *Double D Amusement Co. v. Hawkins,* 20 Utah 2d 395, 438 P.2d 811 (1968).

The essential formula adopted for the measure of damages is the difference between the contract price and the imputed direct costs of performing that contract.

We are satisfied the same result pertains under Wyoming's U.C.C. Article 2.A governs transactions involving leases, and incorporates legal rules and tenets which were part of the common law, in particular, that of bailments for hire. Wyo.Stat. §§ 34.1–2.A–101 to –532. Article 2 on sales generally provides the model for the provisions of Article 2.A relating to remedies. The provisions for remedies of a lessor in the event of a repudiation by a lessee are set forth in Wyo. Stat. § 34.1–2.A–523 (emphasis added):

(a) If a lessee wrongfully rejects or revokes acceptance of goods or fails to make a payment when due or repudiates with respect to a part or the whole, then, with respect to any goods involved, and with respect to all of the goods if under an installment lease contract the value of the whole lease contract is substantially impaired (section 34.1–2.A–510), the lessee is

in default under the lease contract and the lessor may:

(i) Cancel the lease contract (section 34.1–2.A–505(a));

(ii) Proceed respecting goods not identified to the lease contract (section 34.1–2.A–524);

(iii) Withhold delivery of the goods and take possession of goods previously delivered (section 34.1–2.A–525);

(iv) Stop delivery of the goods by any bailee (section 34.1–2.A–526);

(v) **Dispose of the goods and recover damages (section 34.1–2.A–527), or retain the goods and recover damages (section 34.1–2.A–528), or in a proper case recover rent (section 34.1–2.A–529);**

(vi) **Exercise any other rights or pursue any other remedies provided in the lease contract.**

(b) If a lessor does not fully exercise a right or obtain a remedy to which the lessor is entitled under subsection (a), the lessor may recover the loss resulting in the ordinary course of events from the lessee's default as determined in any reasonable manner, together with incidental damages, less expenses saved in consequence of the lessee's default.

(c) If a lessee is otherwise in default under a lease contract, the lessor may exercise the rights and pursue the remedies provided in the lease contract, which may include a right to cancel the lease. In addition, unless otherwise provided in the lease contract:

(i) **If the default substantially impairs the value of the lease contract to the lessor, the lessor may exercise the rights and pursue the remedies provided in subsection (a) or (b); or**

(ii) If the default does not substantially impair the value of the lease contract to the lessor, the lessor may recover as provided in subsection (b).

The disposition of the goods by the lessor is provided for in Wyo.Stat. § 34.1–2.A–527 (emphasis added):

(a) After a default by a lessee under the lease contract of the type described in

section 34.1–2.A–523(a) or 34.1–2.A–523(c)(i) or after the lessor refuses to deliver or takes possession of goods (section 34.1–2.A–525 or 34.1–2.A–526), or, if agreed, after other default by a lessee, the lessor may dispose of the goods concerned or the undelivered balance thereof by lease, sale, or otherwise.

(b) Except as otherwise provided with respect to damages liquidated in the lease agreement (section 34.1–2.A–504) or otherwise determined pursuant to agreement of the parties (sections 34.1–1–102(c) and 34.1–2.A–503), if the disposition is by lease agreement substantially similar to the original lease agreement and the new lease agreement is made in good faith and in a commercially reasonable manner, the lessor may recover from the lessee as damages (1) accrued and unpaid rent as of the date of the commencement of the term of the new lease agreement, (2) the present value, as of the same date, of the total rent for the then remaining lease term of the original lease agreement minus the present value, as of the same date, of the rent under the new lease agreement applicable to that period of the new lease term which is comparable to the then remaining term of the original lease agreement, and (3) any incidental damages allowed under section 34.1–2.A–530, less expenses saved in consequence of the lessee's default.

(c) **If the lessor's disposition is by lease agreement that for any reason does not qualify for treatment under subsection (b), or is by sale or otherwise, the lessor may recover from the lessee as if the lessor had elected not to dispose of the goods and section 34.1–2.A–528 governs.**

(d) A subsequent buyer or lessee who buys or leases from the lessor in good faith for value as a result of a disposition under this section takes the goods free of the original lease contract and any rights of the original lessee even though the lessor fails to comply with one [1] or more of the requirements of this article.

(e) The lessor is not accountable to the lessee for any profit made on any disposition. A lessee who has rightfully rejected or justifiably revoked acceptance shall account to the lessor for any excess over the amount of the lessee's security interest (section 34.1–2.A–508(e)).

The provisions of Wyo.Stat. § 34.1–2.A–528, referred to in Wyo.Stat. § 34.1–2.A–527(c), with respect to the damages of the lessor are:

(a) Except as otherwise provided with respect to damages liquidated in the lease agreement (section 34.1–2.A–504) or otherwise determined pursuant to agreement of the parties (sections 34.1–1–102(c) and 34.1–2.A–503), if a lessor elects to retain the goods or a lessor elects to dispose of the goods and the disposition is by lease agreement that for any reason does not qualify for treatment under section 34.1–2.A–527(b), or is by sale or otherwise, the lessor may recover from the lessee as damages for a default of the type described in section 34.1–2.A–523(a) or 34.1–2.A–523(c)(i), or, if agreed, for other default of the lessee, (1) accrued and unpaid rent as of the date of default if the lessee has never taken possession of the goods, * * *, (2) the present value as of the date determined under clause (1) of the total rent for the then remaining lease term of the original lease agreement minus the present value as of the same date of the market rent at the place where the goods are located computed for the same lease term, and (3) any incidental damages allowed under section 34.1–2.A–530, less expenses saved in consequence of the lessee's default.

(b) **If the measure of damages provided in subsection (a) is inadequate to put a lessor in as good a position as performance would have, the measure of damages is the present value of the profit, including reasonable overhead, the lessor would have made from full performance by the lessee, together with any incidental damages allowed under section 34.1–2.A–530, due allowance for costs reasonably incurred and due credit for payments or proceeds of disposition.** (Emphasis added.)

We are satisfied that the provisions of this statute apply to determine the damages re-

sulting from the repudiation of the lease by The Corner.

We find this pertinent statement as to when profit is the measure of damages in 3A WILLIAM D. HAWKLAND & FREDERICK H. MILLER, UNIFORM COMMERCIAL CODE SERIES § 2A–528:03, at 1102–03 (1993) (footnotes omitted, emphasis added):

> The principal measure of recovery provided by section 2A–528 is the difference between the market rent and the contract rent together with incidental damages. This measure is designed to result in a recovery that approximates the value of the lessor's bargain. Sometimes, however, this formula, which subtracts the market rent from the contract rent does not afford an adequate basis upon which to measure the value of the lessor's bargain. In these cases, the lessor is permitted to compute damages for qualified defaults by proving loss of expected profits.
>
> A simple illustration of a situation in which damages based upon the difference between the market and contract rent do not make the lessor whole is one in which the subject of the lease involves goods that lease under a standard lease contract. For example, suppose that an automobile dealer leases a car to a lessee for $7,500, which is the standard lease offered by this dealer for this car; that the lessee repudiates the deal and refuses to take possession of the car, or pay, and that the lessor then releases the same car to another customer for $7,500. In this case, the lessor would not want to use the rule of section 2A–527 to measure damages, because there is no difference between the release rent and the contract rent. Nor would the dealer want to use the rule for damages stated in section 2A–528(1) [WYO.STAT. § 34.1–2.A–528(a) ], for there also would seem to be no difference between the market and contract rents. **This might suggest that the lessor has not been injured by the repudiation, but the lessor has lost a profit because of the default if another car could have been leased to the second customer; that is, if the lessee had not defaulted, the lessor would have leased two cars instead of one. Stated differently, if it is assumed that the lessor has an unlimited supply of cars, the lessee's default costs the lessor a lease, because no matter how many cars the lessor may lease in a given period, the lessor would have leased one more had the lessee not defaulted. This arguably should be equally true if the dealer could have sold another car to the second customer, because the recovery is not for the profit on the second transaction; that profit exists. The point is that the second transaction should not be made possible by the lessee's default; the absence of that circumstance is what demonstrates a loss to the lessor.** See Comment 2 to section 2A–529. Any economic consequence resulting from a dissimilarity in the transactions can be adjusted by due credit as provided in section 2A–528(2) [WYO.STAT. § 34.1–2.A–528(b) ].[2]

■ This case fits that analysis. Pinnacle produced evidence that "there are a limited number of locations versus a virtually unlimited amount of equipment." The analogy to the example concerning the leasing of cars is clear. Any other transactions or mitigation, including re-leasing, by Pinnacle, would fit because those transactions might have occurred if The Corner had performed. The Corner's repudiation did not make those transactions possible. We hold that, in an instance such as this, the lessor has no duty to endeavor to mitigate damages by re-leasing the equipment because its damages remain the same. It still loses the benefit of its bargain under the lease.

Clearly, WYO.STAT. § 34.1–2.A–528(a) does not afford an adequate basis for measuring Pinnacle's damages. That formula subtracts the market rent from the contract rent and, potentially, would leave Pinnacle with no damages. The result deprives Pinnacle of the profit provided in the lease with The Corner and does not leave it in as good a position as it would have attained if the

2. Wyoming identifies its subsections with uncapitalized letters within parentheses. The uniform act from which Wyoming took its act identifies its subsections with numerals within parentheses.

Agreement had been performed. That is the reason for the provision in Wyo.Stat. § 34.1–2.A–528(b); it is to be invoked "[i]f the measure of damages provided in subsection (a) is inadequate to put a lessor in as good a position as performance would have * * *."

■ We turn to The Corner's argument that Pinnacle is required to deduct as expenses the full costs of the jukebox, $4,500, and the pool table, $1,850, rather than as calculated depreciation for the Agreement's three-year period. Pinnacle's evidence established it had applied a useful life of twenty years to the jukebox and the pool table, and that it deducted as expenses depreciation of $675 on the jukebox and $277.50 on the pool table. We perceive the useful life Pinnacle applied to the jukebox was indeed generous as far as The Corner was concerned, and we find no error in that computation.

We are satisfied, however, that Pinnacle should have deducted the cost of the pool table in arriving at its damages. The damages for the pool table were computed as though the option to purchase at the end of the first twelve months had been exercised by The Corner. The damages for the second and third years of the lease were reduced to $75 per month for the maintenance and league servicing contract. Since the damages were computed in that way, the cost of the pool table ($1,850) should have been credited against these damages rather than the smaller amount of depreciation ($277.50). This adjustment would increase the damages for the lease of the pool table by $277.50 and decrease those damages by $1,850. This leaves a net loss of profits for the pool table of $1,670 instead of the $3,242.50 reflected in Exhibit C. We will remand the case for the trial court to effect that adjustment in the amount of damages to be reduced to the present value.

■ The Corner contends Pinnacle also should be required to deduct overhead expenses it did not incur. The language of our statutes is clear, and it provides, "the measure of damages is the present value of the profit, **including reasonable overhead** * * *." Wyo.Stat. § 34.1–2.A–528(b) (emphasis added). The provision is so stated because the drafters of the U.C.C., as it was

adopted in Wyoming, recognize a difference between the effect of fixed and variable costs. Wyo.Stat. § 34.1–2.A–528(b) is a somewhat revised version of Wyo.Stat. § 34.1–2–708(b) regarding sales. Wyo.Stat. § 34.1–2.A–528, comment 4. A treatise explains that, to bridge the gap between new cases of leased equipment [decided under Wyo.Stat. § 34.1–2.A–528] and those decided under existing law regarding sales [Wyo.Stat. § 34.1–2–708(b) ], the process will be predictable:

> It thus seems likely that, at least initially, the courts will resolve any interpretative difficulties presented by the lessor's profit formula by referring to the voluminous case law that deals with the seller's profit formula. For example, "lost volume" lessors and those left with incomplete goods as a result of the lessee's default will no doubt be allowed ready access to the profit formula in Section 2A–528(2).

2 Roy Ryden Anderson, Damages under the Uniform Commercial Code § 15:14, at 24–25 (1992) (footnote omitted).

In 1 Roy Ryden Anderson, Damages under the Uniform Commercial Code § 2:10, at 20–21 (1992) (footnote omitted, emphasis added), relating to the recovery of overhead under the profit formula of the sales provision of the U.C.C., § 2–708(2), the concept is explained in this way:

> The profit formula of Section 2–708(2) includes a dichotomy of expenses. The formula provides for a recovery by the seller of overhead expenses but requires the seller to account to the buyer for "expenses saved." The distinction is between fixed expenses or "overhead," which are by definition not saved by the breach (e.g., utilities, management salaries, and other fixed costs of doing business), and expenses which are "variable" in that they are attributable only to the breached contract and may be saved if not incurred prior to the breach (e.g., labor, materials, and expenses of transportation attributable to the breached contract).

> Clearly, if the expenses are saved the defendant buyer should be credited with the savings; otherwise the seller will receive a windfall. The important point is

that overhead expenses, which by definition are fixed and do not vary from contract to contract, are not saved when a buyer breaches. That an aggrieved party, whether or not his action is governed by the Code, is entitled to recover such fixed expenses is now well settled by the cases. The clearest discussion of the proposition remains that of Judge Staley in *Vitex Mfg. Corp., Ltd. v. Carbitex* [sic] *Corp.* [377 F.2d 795 (3d Cir.1967)]. If a seller were not allowed to recover from the buyer the percentage of the fixed overhead expenditures attributable to the breached contract, the profitability of the seller's remaining sales transactions would be unfairly reduced. Assume, to borrow Judge Staley's example, that the seller has a fixed overhead of $10,000 and five sales contracts. Each contract then bears $2,000 of the overhead expense. If one of the contracts is breached and the seller is not allowed to recover the $2,000 overhead, each of the remaining contracts will be forced to bear $2,500 of the overhead, and the seller's profitability on these remaining contracts will be reduced accordingly.

**At trial, the most effective way to prove profit plus reasonable overhead under Section 2–708(2) is to establish the unpaid price of the breached contract and to deduct only the variable expenses attributable to it. The resulting figure would then include both profit and fixed overhead expenses. The courts have uniformly approved this procedure.** This technique will avoid the near impossibility of proving every item of a seller's overhead and the tedium of having opposing counsel object time and again as to the unreasonableness of each and every item.

This formula has been approved in the decided cases. *Teradyne, Inc. v. Teledyne Industries, Inc.*, 676 F.2d 865 (1st Cir.1982); *Vitex Mfg. Corp., Ltd. v. Caribtex Corp.*, 377 F.2d 795 (3d Cir.1967); *Jericho Sash & Door Co., Inc. v. Bldg. Erectors, Inc.*, 362 Mass. 871, 286 N.E.2d 343 (1972). *But see Rogerson Aircraft Corp. v. Fairchild Indus., Inc.*, 632 F.Supp. 1494 (C.D.Cal.1986) (calculating damages by adding overhead back into recovery of "net" profit under § 2–708(2)). *See also Universal Power Sys., Inc. v. Godfa-*

*ther's Pizza, Inc.*, 818 F.2d 667 (8th Cir. 1987); *Scullin Steel Co. v. Paccar, Inc.*, 708 S.W.2d 756 (Mo.Ct.App.1986) (dealing with "variable overhead expense"). We hold that, except for the pool table, the trial court correctly applied the provisions of WYO.STAT. § 34.1–2.A–528(b) in calculating the damages awarded to Pinnacle, and those calculations are supported by the evidence.

■ A final contention of The Corner is that the Agreement requires Pinnacle to use records of income from its machines to calculate income from the cigarette machines and dartboards. Pinnacle did not have any record of income from machines it had placed at The Corner and, therefore, The Corner contends Pinnacle is unable to demonstrate its damages. The Corner also contends the U.C.C. does not apply in calculating damages because the Agreement provides for no rent concerning the cigarette machines and the dartboard. We hold that the U.C.C. does apply to the calculation of the damages on the dartboard and the cigarette machines.

WYO.STAT. § 34.1–1–106 sets forth the policy of the U.C.C. concerning the application of its provisions:

> (a) **The remedies provided by this act [§§ 34.1–1–101 through 34.1–10–104] shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed** but neither consequential or special nor penal damages may be had except as specifically provided in this act or by other rule of law. (Emphasis added.)

Official Comment 1 with respect to this section states, in pertinent part:

> The third purpose of subsection (1) [Wyo. Stat. § 34.1–1–106(a) ] is to reject any doctrine that damages must be calculable with mathematical accuracy. **Compensatory damages are often at best approximate: they have to be proved with whatever definiteness and accuracy the facts permit, but no more.** (Emphasis added.)

The language of WYO.STAT. § 34.1–2.A–528(b) (emphasis added) includes the statement that **"the measure of damages is the present value of the profit * * *."** We have ad-

dressed uncertainty and indefiniteness with respect to contract damages and adopted the rule that calculation of lost future profits must be made with the "best proof available as to amount of loss." *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 548 (Wyo. 1993) (quoting *Wyoming Bancorporation v. Bonham*, 563 P.2d 1382, 1385, *reh'g denied*, 566 P.2d 219 (Wyo.1977). That profit may be the result of commissions, rents, shared revenues, or whatever form the lease provides for the derivation of profits.

The revenue figures for a dartboard and cigarette machines were provided to Pinnacle by The Corner for the year immediately preceding the lease between Pinnacle and The Corner. These figures accounted for seasonal variations; were from the same location and clientele to be served by Pinnacle's machines; and they do appear to be the best proof available. The Corner made no effort to demonstrate these figures were not the best proof available. In light of the provision for liberal administration of the U.C.C. so the aggrieved party may be put in as good a position as if the other party had fully performed, we approve the method of proving damages used by Pinnacle, which the trial court relied upon. The evidence was sufficient to ascertain the damages, and the trial court did not abuse its discretion in using those figures.

We hold that the damages were correctly established under the U.C.C., and the trial court did not invoke the liquidated damages clause of the Agreement. The Corner was not penalized by the calculation of damages by the trial court, which correctly applied WYO.STAT. § 34.1–2.A–528(b) providing for lost profits as the measure of damages. The damages for the lease of the pool table must be adjusted by deducting the cost of the pool table and adding the amount allowed for depreciation. That has the effect of reducing the total damages by $1,572.50. We affirm the judgment entered by the trial court, but we remand the case for the entry of a corrected judgment in favor of Pinnacle.

## APPENDIX

DAMAGE CALCULATIONS

| ITEM | AMOUNT | PERIOD | TOTALS |
|---|---|---|---|
| **JUKEBOX** | | | |
| Revenue | $65.00/wk | 156 weeks | $10,140.00 |
| Total Revenue | | | $10,140.00 |
| Expenses | | | |
| License Fees | | | $159.00 |
| Parts | | | $0.00 |
| Labor | | | $900.00 |
| CD's | | | $400.00 |
| Depreciation | | | $675.00 |
| Total Expenses | | | $2,134.00 |
| JUKEBOX-NET LOSS OF PROFITS | | | $8,006.00 |
| **POOL TABLE** | | | |
| Revenue | | | |
| Down Payment | 400 | 1 | $400.00 |
| 1st Year | $250.00/Mo | 12 Months | $3,000.00 |
| 2nd & 3rd Yrs | $75.00/Mo | 24 Months | $1,800.00 |
| Total Revenue | | | $5,200.00 |
| Expenses | | | |
| Table Maintenance | | | $450.00 |
| Supplys | | | $150.00 |
| Labor | | | $1,080.00 |
| Depreciation | | | $277.50 |
| Total Expenses | | | $1,957.50 |
| POOL TABLE-NET LOSS OF PROFITS | | | $3,242.50 |
| **CIGARETTES** | | | |
| Revenue | | | |
| Gross Income | $205.83/wk | 156 weeks | $32,109.48 |
| Total Revenue | | | $32,109.48 |
| Expenses | | | |
| Product Costs | 60% | | $19,265.85 |
| Commission | 10% | | $3,210.98 |
| Labor | | | $1,260.00 |
| Depreciation | | | $600.00 |
| Total Expenses | | | $24,336.83 |
| CIGARETTES-NET LOSS OF PROFITS | | | $7,772.65 |
| **DARTS** | | | |
| Revenue | | | |
| Gross Income | $15.57/wk | 156 weeks | $2,428.92 |
| Total Revenue | | | $2,428.92 |
| Expenses | | | |
| Supplies | | | $20.00 |
| Commission | 50% | | $1,214.46 |
| Labor | | | $360.00 |
| Depreciation | | | $570.00 |
| Total Expenses | | | $2,164.46 |
| DARTS-NET LOSS OF PROFITS | | | $264.46 |
| **TOTAL DAMAGES** | | | |
| JUKEBOX | | | $8,006.00 |
| POOL TABLE | | | $3,242.50 |
| CIGARETTES | | | $7,772.65 |
| DARTS | | | $264.46 |
| LEGAL EXPENSES | EXHIBIT D | | $2,401.73 |
| TOTAL DAMAGES | | | $21,687.34 |

PLAINTIFF'S EXHIBIT C