2004 WY 162

**In the Interest of RM, a minor**

**In the Interest of BC, a minor**

**RM and BC, Appellants (Respondents),**

v.

**Washakie County School District Number One; and Wyoming School Boards Association, Appellees (Intervenors).**

**No. C–03–2.**

Supreme Court of Wyoming.

Dec. 10, 2004.*

* Final decision of the court rendered on November 29, 2004.

Representing Appellants: John P. Worrall and Kyle R. Smith of Worrall & Greear, PC, Worland, WY; John M. Burman, Faculty Supervisor, and Nick Beduhn and Meredith Asay, Student Interns, of the University of Wyoming Legal Services Program, Laramie, WY. Argument by Mr. Smith and Ms. Asay.

Representing Appellees: Tracy J. Copenhaver and Scott E. Kolpitcke of Copenhaver, Kath, Kitchen & Kolpitcke, LLC, Powell, WY. Argument by Mr. Kolpitcke.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] This case comes to this court as a reserved constitutional question pursuant to Wyo. Stat. Ann. § 1–13–101 (LexisNexis 2003). Washakie County School District Number One (the School District) expelled two students for a period of one year. These two students were also subject to actions under the Juvenile Justice Act, and both were adjudged delinquent. During the juvenile proceedings, the court ordered the School District to provide both students with a free and appropriate education during the period of expulsion. The School District and the Wyoming School Boards Association (WSBA) intervened and made a motion for an order reserving a constitutional question. Thus, we are asked to consider whether the provisions of the Wyoming constitution require a school district to provide an education to a student who has been lawfully expelled. We answer the reserved question in the negative.

## RESERVED CONSTITUTIONAL QUESTION

[¶ 2] The parties each state the reserved question in a slightly different manner. The question as stated by the juvenile court is:

Do the provisions of Wyoming Constitution Article 1, Section 3, or the provisions of Wyoming Constitution Article 7, Section 9, require a public school district that has lawfully expelled a student for a period of one (1) year or less to continue to provide an educational program to a student adjudged to be a juvenile delinquent?

The basic argument presented by the parties in their briefs is whether an alternate education must be provided for lawfully expelled students under the Wyoming constitution. We determine that this is a proper characterization of the issue we must resolve.

## FACTS

[¶ 3] RM and BC were caught selling marijuana to other students while on school grounds. After a hearing before the School District's board of trustees, the board unanimously elected to expel both students from school for a period of one year, finding that RM's and BC's acts were detrimental to the safety, education, and welfare of the other students in the district. The expulsions were not appealed, and there is no issue as to the propriety of the expulsions.

[¶ 4] Petitions were also filed in the juvenile court pursuant to the Juvenile Justice Act alleging both juveniles to be delinquent. In separate juvenile court proceedings, each juvenile admitted to the allegation that he was a delinquent child. In addition to the terms of probation for each child, the juve-

nile court ordered the School District to provide RM and BC with a free and appropriate education during the period of the student's expulsion. In doing so, the juvenile court specifically concluded that the School District had an obligation under the Wyoming constitution to provide such an education to these students.

[¶ 5] The School District also expelled a third student for selling marijuana on school grounds. This third student had been previously identified as a special education student and was receiving services pursuant to his individualized education plan (IEP). Pursuant to federal statute and Department of Education rules governing special education, this student continued to receive the educational services mandated by his IEP.

[¶ 6] After the juvenile court's entry of orders requiring the School District to provide a free and appropriate education to RM and BC, the School District and the WSBA were allowed to intervene in the juvenile court action. These parties requested that the juvenile court reserve the question of constitutional law to this court. For purposes of allowing this review to proceed, the School District agreed to waive any objection to lack of notice and opportunity to participate. The juvenile court agreed to reserve the constitutional question, and this court accepted the reserved question of constitutional law as presented above. The School District did not provide any educational services to either student during the terms of their respective expulsions.

## STANDARD OF REVIEW

[¶ 7] The district court's interpretation of the requirements of the Wyoming constitution and the resulting constitutional question presents a question of law, which we review *de novo*. *Eklund v. Farmers Ins. Exch.*, 2004 WY 24, ¶ 10, 86 P.3d 259, ¶ 10 (Wyo.2004).

In construing our constitution, we follow essentially the same rules as those governing the construction of a statute. The fundamental purpose of those rules of construction is to ascertain the intent of the framers. *Geringer v. Bebout*, 10 P.3d 514, 521 (Wyo.2000); *Zancanelli v. Central*

*Coal & Coke Co.*, 25 Wyo. 511, 173 P. 981, 991 (1918). "We are charged with discerning the intent of the Constitutional Convention, and we look first to the plain and unambiguous language to discern that intent." *Geringer*, 953 P.2d at 843.

*Director of Office of State Lands & Invs. v. Merbanco*, Inc., 2003 WY 73, ¶ 33, 70 P.3d 241, ¶ 33 (Wyo.2003).

## DISCUSSION

[¶ 8] Because this case comes before us after the expiration of the student's term of expulsion, it is appropriate that we first address the issue of mootness. While it is true that this question is technically moot because the expulsion period is over, there are exceptions to the mootness doctrine. One exception is if the case presents an issue of great public importance. See *Walker v. Board of County Comm'rs*, 644 P.2d 772, 774 (Wyo.1982). The question of what constitutes great public importance rests with this court, and we find this case to present such an issue. *Jolley v. State Loan & Inv. Bd.*, 2002 WY 7, ¶ 10, 38 P.3d 1073, ¶ 10 (Wyo. 2002). Specifically, the reserved question involves the recognized fundamental right to an education and an interpretation of the provisions of our constitution providing for that right. Although not all cases involving fundamental rights and constitutional interpretation present an issue of great public importance sufficient to overcome the mootness doctrine, this matter does so because it involves the significant issue of education in an area not previously considered by this court. As such, this action presents this court with the opportunity to consider the constitution in a manner not considered before and is of sufficient importance to warrant a full discussion.

[¶ 9] Another important exception, likewise applicable in this instance, is if the case presents a controversy capable of repetition yet evading review. See *Board of County Comm'rs v. Exxon Mobil Corp.*, 2002 WY 151, ¶ 18, 55 P.3d 714, ¶ 18 (Wyo.2002). Under Wyoming statute a school district can expel a student for a maximum period of one year. Wyo. Stat. Ann. § 21–4–305(d) (Lexis-

Nexis 2003).[1] Given the time it takes for a case to reach this court, it is unlikely that a one-year expulsion term will ever be intact when a case gets to the point of our review. As such, if mootness stands as a barrier to considering the question in this case, it likely always will. Accordingly, we find it appropriate to consider this issue at this time.

[¶ 10] We are also compelled to comment on the procedural oddities that attended this case. This case is presented and argued to this court as a reserved constitutional question pursuant to § 1–13–101 and W.R.C.P. 52(d). Section 1–13–101 reads:

> When an important and difficult constitutional question arises in a proceeding pending before the district court on motion of either party or upon his own motion the judge of the district court may cause the question to be reserved and sent to the supreme court for its decision.

Rule 52(d) is a reduction to rule form of the applicable case law regarding proceedings pursuant to § 1–13–101. Rule 52(d) states:

> (d) *Reserved questions.*—In all cases in which a court reserves an important and difficult constitutional question arising in an action or proceeding pending before it, the court, before sending the question to the supreme court for decision, shall (1) dispose of all necessary and controlling questions of fact and make special findings of fact thereon, and (2) state its conclusions of law on all points of common law and of construction, interpretation and meaning of statutes and of all instruments necessary for a complete decision of the case. No constitutional question shall be deemed to arise in an action unless, after all necessary special findings of fact and conclusions of law have been made by the court, a decision on the constitutional question is necessary to the rendition of final judgment. The question reserved shall be specific, and shall identify the constitutional provision to be interpreted. The special findings of fact and conclusions of law re-

quired by this subdivision of this rule shall be deemed to be a final order from which either party may appeal, and such appeal may be considered by the Supreme Court simultaneously with the reserved question.

In this instance, the School District and the WSBA were not parties to the juvenile court action. Consequently, they never presented evidence or participated in the proceedings before they intervened nor did they present evidence after they intervened. The district court, therefore, never had the opportunity to make findings of fact on any evidence that the School District and WSBA may have presented. Nevertheless, the underlying case in this appeal is a juvenile action alleging both juveniles to be delinquent. The findings necessary for a complete decision in that case have been made. All that remains to be determined is the constitutional question. We similarly conclude that the district court has made adequate findings of fact and conclusions of law for our purposes and that additional findings are not necessary.

[¶ 11] With these preliminary matters addressed, we finally arrive at the constitutional question before us. The first order of business is to determine the level of constitutional analysis to apply. The School District and the WSBA advance the argument that the rational basis test applies in this situation. In doing so they cite to *Doe v. Sup't of Schools of Worcester*, 421 Mass. 117, 653 N.E.2d 1088 (1995) and *Kolesnick v. Omaha Pub. Sch. Dist.*, 251 Neb. 575, 558 N.W.2d 807 (1997). The courts in both these cases determined that even though education had been found to be a fundamental right under their state constitutions and strict scrutiny applied when considering school funding issues, rational basis review was the proper level of review for analyzing a suspension or expulsion.

[¶ 12] In making this determination the *Doe* court found that the Massachusetts constitution did not guarantee each individual student the fundamental right to an edu-

---

1. Wyo. Stat. Ann. § 21–4–305(d) provides:
   The board of trustees of any school district or the superintendent if designated, may suspend a student for a period exceeding ten (10) school days or may expel a student for a period not to exceed one (1) year, provided the student is afforded an opportunity for a hearing in accordance with the procedures of the Wyoming Administrative Procedure Act [§§ 16–3–101 through 16–3–115].

cation. *Doe,* 653 N.E.2d at 1095. The court refused to hold that a fundamental right existed "which would trigger strict scrutiny analysis whenever school officials determine, in the interest of safety, that a student's misconduct warrants expulsion." *Id.* In doing so, the court seemed to accept the idea that education is a community right not an individual right. Therefore, the right may be lost by conduct detrimental to the community as a whole. *Id.* The *Kolesnick* court held similarly. See *Kolesnick,* 558 N.W.2d at 813. While the rationale for this distinction undoubtedly has its merits, we find it incompatible with our constitution and our previous interpretations of the constitutional provisions pertaining to education.

[¶ 13] When considering the issue of education, we have stated: "In the light of the emphasis which the Wyoming Constitution places on education, there is no room for any conclusion but that education for the children of Wyoming is a matter of fundamental interest." *Washakie County Sch. Dist. No. One v. Herschler,* 606 P.2d 310, 333 (Wyo.1980). Our extensive analysis in *Washakie* considered the Wyoming constitution as a whole, citing to many provisions of the Wyoming constitution pertaining to education. Some of the provisions cited include, art. 1 § 28, art. 1 § 23, art. 7 § 1–14, and art. 21 § 28. *Id.,* at 319–33. In looking at these various provisions, we concluded that the founders of our state placed fundamental importance on education and, therefore, strict scrutiny must apply. *Id.,* at 333. " 'Strict scrutiny' is the standard applied when it becomes necessary to balance a fundamental right against a compelling state interest. It requires the establishment of the compelling state interest and the showing that the method of achieving such is the least intrusive of those methods by which such can be accomplished." *Michael v. Hertzler,* 900 P.2d 1144, 1147 (Wyo.1995).

[¶ 14] After *Washakie,* several cases involving the right to education followed, in which this court further considered the applicable analysis. In *Campbell County Sch. Dist. v. State,* 907 P.2d 1238, 1266 (Wyo.1995) we explained, "[t]he triggering issue in *Washakie* was wealth-based disparities; however,

we now extend that decision beyond a wealth-based disparity to other types of causes of disparities." We then went on to state:

Because the right to an equal opportunity to a proper education is constitutionally recognized in Wyoming, any state action interfering with that right must be closely examined before it can be said to pass constitutional muster. Such state action will not be entitled to the usual presumption of validity; rather, the state must establish its interference with that right is forced by some compelling state interest and its interference is the least onerous means of accomplishing that objective.

*Id.,* at 1266–67. See also *State v. Campbell County Sch. Dist.,* 2001 WY 19, ¶ 42, 19 P.3d 518, ¶ 42 (Wyo.2001).

[¶ 15] In *Campbell,* we likewise noted that the interaction of the various components revealed the necessity to review the financial system as a whole under one level of scrutiny. *Campbell,* 907 P.2d at 1267. Although that conclusion pertained to whether various provisions of the school financing system should be reviewed under different levels of scrutiny, we find the import of that statement equally applicable in this instance. Education and how it is funded, maintained, and provided on a day-to-day basis is complex and made up of many different interconnected parts. We, therefore, think it unwise and in many respects impractical to use different constitutional tests for the various aspects of that important right. Thus, we conclude that strict scrutiny is the appropriate test to apply to the matter at hand.

[¶ 16] The first thing to determine under the strict scrutiny test is whether the state has a compelling interest to protect. The School District asserts that they have a compelling interest in providing for the safety and welfare of its students and that it is this interest that the expulsions protect. We agree. There is little doubt that the safety and welfare of students in the state are of utmost importance. Article 7 § 9 of the Wyoming Constitution requires that the legislature create and maintain "a thorough and efficient system of public schools." As noted by the West Virginia Supreme Court of Ap-

peals, implicit within the constitutional guarantee of "a thorough and efficient system of free schools" is the need for a safe and secure school environment. A school cannot fulfill its basic purpose of providing an education without such an environment. *Phillip Leon M. v. Greenbrier County Bd. of Educ.*, 199 W.Va. 400, 484 S.E.2d 909, 914 (1996) (overruled on other grounds by *Cathe A. v. Doddridge County Bd. of Educ.*, 200 W.Va. 521, 490 S.E.2d 340 (1997)). Indeed, RM and BC rightfully concede that the School District's interest in this area is compelling and that expulsions further this interest.

[¶ 17] Having concluded that a compelling state interest exists, we must next determine whether the School District's actions are the least onerous means of accomplishing that compelling interest. The majority of RM's and BC's argument focuses on this step of the analysis. They claim that expulsion without providing alternate educational benefits is not narrowly tailored to serve the state's interest. Instead, they argue that providing students with an alternate education is less onerous because each student would still be receiving educational services. Thus the student's right to an education is more thoroughly and precisely protected when an alternate education is provided. We do not agree that an alternate education must be provided for several reasons.

[¶ 18] First, in deciding whether the action is narrowly tailored in this case, it is important to remember the fundamental right at stake. Article 1 § 23 of the Wyoming Constitution states: "The right of the citizens to opportunities for education should have practical recognition. The legislature shall suitably encourage means and agencies calculated to advance the sciences and liberal arts." As can be seen by the language of the constitution, the fundamental right provided is an *opportunity* for an education. After considering the various provisions of the constitution related to education, we have noted "[t]he sense of *Washakie* was to require the legislature to examine the entire education system, including its funding, and reform it in order to provide an 'equal opportunity for a quality education.'" *Campbell*, 907 P.2d at

1263. The state's obligation then is to, "provide an education system of a character which provides Wyoming students with a uniform opportunity to become equipped for their future roles as citizens, participants in the political system, and competitors both economically and intellectually." *Id.*, at 1259.

[¶ 19] The school district has provided such a system and, as a result, has given RM and BC an equal opportunity for a quality education. However, the fundamental right to an opportunity for an education does not guarantee that a student cannot temporarily forfeit educational services through his own conduct. Educational services are provided with reasonable conditions because the Wyoming constitution requires that *all* students receive an equal opportunity to a quality education. *State v. Campbell County Sch. Dist.*, 2001 WY 90, ¶ 1, 32 P.3d 325, ¶ 1 (Wyo.2001). The actual receipt of educational services is accordingly contingent upon appropriate conduct in conformity with state law and school rules. The North Carolina Court of Appeals reasoned:

> [A]s this Court stated in *Fowler v. Williamson*, 39 N.C.App. 715, 718, 251 S.E.2d 889, 891 (1979), "[t]he right to attend school and claim the benefits of the public school system is subject to lawful rules prescribed for the government thereof." A student's right to an education may be constitutionally denied when outweighed by the school's interest in protecting other students, teachers, and school property, and in preventing the disruption of the educational system. As a general rule, a student may be constitutionally suspended or expelled for misconduct whenever the conduct is of a type the school may legitimately prohibit, and procedural due process is provided. Reasonable regulations punishable by suspension do not deny the right to an education but rather deny the right to engage in the prohibited behavior. See *Craig v. Buncombe Co. Board of Education*, 80 N.C.App. 683, 343 S.E.2d 222 (1986).

*In re Jackson*, 84 N.C.App. 167, 352 S.E.2d 449, 455 (1987).

[¶ 20] Additionally, while the *Doe* court ultimately decided that rational basis was the appropriate level of scrutiny to apply, the court provided sound reasoning regarding the opportunity for an education and its relationship to school discipline. Therein, the court stated, "It reasonably may be argued that a requirement that a student who is expelled for misconduct, no matter how egregious, be provided with alternate education by a public school system, would be likely to have a serious detrimental effect on the ability of school officials to deter dangerous behavior within a school by imposing expulsion as a sanction." *Doe*, 653 N.E.2d at 1097. "A child may be entitled to an education but is not entitled to disrupt or to endanger the educational process." *Id.*, at 1103 (Liacos, Chief Justice, dissenting, arguing that strict scrutiny should be applied). We agree with this reasoning. The power to prohibit conduct is ineffective without the additional capacity to impose penalties for noncompliance. We, therefore, conclude that a student may temporarily have his educational services suspended if his conduct threatens the safety and welfare of other students and school employees and thereby interferes with the school district's obligation to provide an equal opportunity for a quality education to all the students of that district.

[¶ 21] Second, the term of each student's expulsion lasts for only one year. As mentioned above, Wyoming statute does not allow a school to expel a student permanently. The "fact that the forfeiture is temporary is important" because "temporary deprivation of constitutional rights does not require the protection that a permanent deprivation would." *Cathe A. v. Doddridge County Bd. of Educ.*, 200 W.Va. 521, 490 S.E.2d 340, 355 (1997) (Workman, Chief Justice, concurring in part and dissenting in part, citing *Keith D. v. Ball*, 177 W.Va. 93, 350 S.E.2d 720, 723 n. 3 (1986)). Indeed, RM's and BC's argument that the action is not narrowly tailored is based on the premise that the school district's action in expelling them without an alternate education "denied all educational opportunities to the students." We do not believe this to be the case. The temporary suspension of educational services is not the denial of all educational opportunities. Students in Wyoming may attend school until the age of 21. See Wyo. Stat. Ann. § 21–4–301 (LexisNexis 2003). Following the expiration of the expulsion term students can return to school and once again receive educational services. Accordingly, RM and BC are not being denied all educational opportunity. Following a suspension it is the student's choice whether or not to return to school.

[¶ 22] Third, a school district is not required to expel every student in every instance, nor is there a policy that alternate education cannot be provided. In arguing that the School District was required to provide an alternate education, the juvenile court cited to *Cathe A. v. Doddridge County Bd. of Educ.*, 200 W.Va. 521, 490 S.E.2d 340. While we agree with the *Cathe A.* court that strict scrutiny is the proper level of constitutional analysis, several factors at work in that case are distinguishable from the case at hand and, as a result, we find the ultimate analysis and conclusion inapplicable.

[¶ 23] In *Cathe A.*, the court was called on to consider the West Virginia Productive and Safe Schools Act, which required expulsion for bringing a weapon to school. The court first noted that in West Virginia education is a fundamental right and therefore the strict scrutiny test must be applied. *Id.*, at 346–47. The court then noted that the need for a safe and secure environment is implicit in the guarantee of a thorough and efficient system of schools, and that the legislature was entitled to believe that only a 12-month expulsion would serve as an effective deterrent to further that important goal. *Id.*, at 348 (citing *Phillip Leon M.*, 484 S.E.2d at 914). Thus, the court concluded that the act requiring expulsion for weapons violations was not facially unconstitutional.

[¶ 24] However, following its discussion of the facial constitutionality of the act, the court sought to determine whether an alternate education must be provided and conducted an "as applied" analysis in light of two West Virginia policies. The first policy was that an alternate education would be provided to an expelled student only if that student's parents paid for it. The court found

that this policy was not narrowly tailored. *Id.*, at 349. In making this finding the court found that a child's fundamental right to an education, including the right to be provided with educational opportunities and services, which can be limited by narrowly tailored restrictions necessary to achieve a compelling state interest, cannot be conditioned on the child's or parent's ability or willingness to reimburse the state. *Id.*, at 349. The second policy was a state superintendent policy mandating that a child who was removed by the act was not entitled to any state-funded instruction during the pendency of their expulsion. *Id.*, at 350. The court stated:

> A policy to the effect that the State has *no* responsibility to provide *any* state-funded educational opportunities and services to *any* children who are expelled under the Productive and Safe Schools Act, W.Va.Code, 18A–5–1a(g) [1995] is constitutionally infirm because the State has not shown that applying such a limitation to *all* such children under *all* circumstances is reasonably necessary and narrowly tailored to further the compelling state interest in safe and secure schools.

*Id.*, at 350 (emphasis in original). No comparable policies are at work in this case, and we therefore find that the court's analysis is not strictly applicable.

[¶ 25] Indeed, in circumstances such as those before us, a school district is not required to expel a student but must determine whether to do so on a case-by-case basis. As such, that district can tailor the length of a suspension according to each student's circumstances. Because school districts must tailor their decisions to deny educational services to fit the circumstances of each case, the temporary expulsion of students is narrowly tailored to fit the state's compelling interest in protecting the safety and welfare of its students.[2] Furthermore, the school districts are in the best position to judge the student's actions in light of all the surrounding circumstances and tailor the appropriate punishment to fit the unique circumstances of each student's situation. Because Wyoming does not have a policy that an alternate education cannot be provided, the decision whether to provide such services can similarly be determined on a case-by-case basis.[3] In tailoring the appropriate response when faced with such a decision, the school district can then balance the compelling state interest of needing to protect other students, teachers, and staff, as well as the need to deter other children from engaging in the same type of conduct against the student's fundamental right to an opportunity for an education.

[¶ 26] In light of these considerations, we determine that a school district is not constitutionally required to provide an alternate education to lawfully expelled students. Furthermore, because the school district must consider all of the surrounding circumstances and cannot expel a student for more than a year, we find that expulsions without an alternate education are a narrowly tailored interference with a child's right to an opportunity for a quality education. Lastly, RM and BC argue that many social policies exist for providing an alternate education, such as increased academic abilities, decreased disruptive behavior, and decreased drop out rates. We would note that just as no one doubts that the state had a compelling interest in keeping schools safe, we are confident that no one doubts that these policies are indeed good and worthwhile policies. However, we must agree with Chief Justice Workman in *Cathe A,* wherein he said:

> In an ideal world it surely would be preferable to provide an alternative education to students who are expelled; and even in our own imperfect world, it is still a better idea to do so (at least in my opinion). However, we are judges, *not* legislators; and unless the legislation is determined to be unconstitutional, it is really properly a leg-

---

2. We note that a statute similar to the West Virginia Productive and Safe Schools Act requiring expulsion for weapons violations exists in Wyoming. See Wyo. Stat. Ann. § 21–4–305(a) (LexisNexis 2003). Because that statute was not the basis for RM's and BC's expulsions, we do not consider that statute at this time.

3. Because RM and BC did not appeal their expulsions we have no record to review whether such consideration was given in this case.

islative decision as to what is a good idea. Thus, the only proper inquiry for this Court is whether our state constitution *requires* the provision of such educational services. And the answer to this question is quite clearly that the constitution does not require it.

*Cathe A. v. Doddridge County Bd. of Educ.,* 490 S.E.2d at 354–55 (Workman, Chief Justice, concurring in part and dissenting in part).[4]

[¶ 27] RM and BC also argue that their expulsion violates equal protection because students covered by the Individuals with Disabilities Education Act (IDEA) receive educational services if they are expelled. See 20 U.S.C. § 1412(a)(1)(A). IDEA is a federal law pertaining to the education of disabled students. IDEA creates certain procedural and substantive protection for the education of disabled students. Although the act is mandated by the federal government and backed up with federal funds, its application in Wyoming must nevertheless be analyzed under the same strict scrutiny test in determining whether its requirements present an equal protection violation. Thus, we must first determine whether the state has a compelling state interest to protect. In *Honig v. Doe,* 484 U.S. 305, 309, 108 S.Ct. 592, 596–97, 98 L.Ed.2d 686, 698 (1988) (citations omitted) the United States Supreme Court explained some of the rationale behind the act.

> [C]ongressional studies revealed that better than half of the Nation's 8 million disabled children were not receiving appropriate educational services. Indeed, one out of every eight of these children was excluded from the public school system altogether; many others were simply "warehoused" in special classes or were neglectfully shepherded through the system until they were old enough to drop out. Among the most poorly served of disabled students were emotionally disturbed children: Congressional statistics revealed that for the school year immediately preceding passage of the Act, the

educational needs of 82 percent of all children with emotional disabilities went unmet.

[¶ 28] We believe that this history presents a compelling interest in treating children with disabilities differently than those without disabilities. The history of discrimination and inadequate educational services for disabled children, compounded with the hardship disabled children face in overcoming their disability, presents a compelling interest. Furthermore, the IDEA is a narrowly tailored method of providing for that interest. Providing services to disabled students covered by IDEA, without providing the same services to non-disabled students is narrowly tailored in rectifying the long history of disparity that existed for disabled students. We can think of no other less onerous means of remedying this disparity. As such, we find that there is no equal protection violation.

### *CONCLUSION*

[¶ 29] We hold that the Wyoming constitution does not require that an alternate education be provided to students who have been lawfully expelled. We similarly find that it does not violate equal protection to provide an alternate education to disabled students that are expelled while not providing such an education for non-disabled students. As a result, we answer the reserved constitutional question in the negative.

GOLDEN, J., filed a dissenting opinion.

GOLDEN, Justice, dissenting.

[¶ 30] I respectfully dissent. I do not believe this Court has the authority to alter the reserved question. The reserved question presented was specifically limited to the constitutional requirements of a public school district to provide an alternative education to properly expelled youths who are also adjudged delinquent. The question does not address the generic situation of expelled youths generally. The difference is significant. The question reserved includes, by

---

4. Legislatures in other states have decided that providing an alternate education is a "good idea" and have determined that an alternate education must be provided to lawfully expelled students. *See, e.g.,* Neb.Rev.Stat. § 79–266 (2003); Miss.Code Ann. § 37–13–92 (2004).

implication, the jurisdiction of the juvenile court. By altering the question, the majority has taken the question out of context and the result is an advisory opinion with no application to the underlying case.

[¶ 31] RM and BC were lawfully expelled from school and did not directly appeal their expulsions or bring declaratory judgment actions challenging the constitutionality of the terms and conditions of their expulsions (including the absence of any provision for publicly provided alternative education). The majority opinion would be appropriate only if this Court were reviewing the results of such a declaratory action.

[¶ 32] A great deal of analysis in the majority opinion is spent on the constitutionality of expulsion. Yet the expulsion is not at issue. The issue is whether the juvenile court can order the public school district to provide a free and appropriate alternative education to the expelled youths adjudged delinquent. Constitutionally, the question is whether the state has a compelling interest in not providing expelled students adjudged delinquent with an alternative education and whether not providing an alternative education to these students is narrowly tailored to meet that compelling interest. Neither question is answered by the majority opinion.

The conclusion of the majority opinion is that the Wyoming Constitution does not demand the provision of alternative education to expelled students, but nothing prevents the provision of alternative education.[1] Thus, the majority opinion leaves open the possibility that the juvenile court can order a public school district to provide alternative education, exactly what the juvenile court did in the underlying case and what the public school district is attempting to protest.[2]

[¶ 33] The particular context of the actual reserved question presented does not lend itself to proper review by this Court. The reserved question, while raising a constitutional issue, also specifically refers to the students being subject to the authority of the juvenile court and having been adjudged delinquent. In their respective subsequent delinquency proceedings, the juvenile court, without the participation of the School District, ordered the School District to provide RM and BC with a free and appropriate education. In the juvenile court action, the ultimate goal of the specific order was to ensure that RM and BC received a free alternative education during the term of their respective expulsions. Instead of investigating other possible sources of authority for ordering a free and appropriate education from any available, appropriate source,[3] the

---

1. This answer raises its own questions, such as potential equal protection issues.

2. By answering only a generic question, the majority opinion also leaves open the question of which governmental entity should be responsible for providing and paying for an alternative education, if such were to be ordered and provided to expelled students adjudged delinquent.

3. For instance, there is no discussion of the authority of the juvenile court to order placement of the juveniles in a facility such as Cathedral Home or Normative Services where the juveniles would receive an education. Also, it could be argued that the juvenile court has the authority to order the School District to provide free and appropriate educational services to expelled students based upon the statutory and equitable powers possessed by the juvenile court granting it the flexibility to deal with the needs of juveniles. This judicially recognized and supported flexibility is best illustrated by the cases of *In re NG*, 14 P.3d 203 (Wyo.2000), and *In Re DCP*, 2001 WY 77, 30 P.3d 29 (Wyo.2001). In *In re NG*, a juvenile court ordered the Department of Family Services (DFS) to pay for electronic monitoring services provided to a juvenile. The ser-

vices were provided to the juvenile while the juvenile was subject to a Child In Need Of Supervision (CHINS) action, but not pursuant to the CHINS action. The services had been ordered by the municipal court in a different case and were continued after the municipal court order had expired. Certainly there is no constitutional requirement that DFS provide such services. Despite that fact, and the fact that the services were never ordered as part of the CHINS proceeding, the *NG* Court affirmed the order of the juvenile court, citing the authority of Wyo. Stat. Ann. § 14–6–403(a)(ii):

(a) Coincident with proceedings concerning a minor alleged to be in need of supervision, the court has jurisdiction to:

. . . .

(ii) Order any party to the proceedings to perform any acts, duties and responsibilities the court deems necessary; . . . .

In its reliance upon this statute, the *NG* Court emphasized that juvenile courts must have the authority to be flexible because "[i]t is not reasonable to expect the legislature to foresee every method that might be employed to assist a juvenile." *NG*, 14 P.3d at 205.

juvenile court relied instead solely upon its interpretation of a constitutional mandate upon the public school district.

[¶ 34] It has long been held that this Court will not determine constitutional questions when a decision can be based upon other grounds. Further, W.R.C.P. 52(d) states that "[n]o constitutional question shall be deemed to arise in an action unless, after all necessary special findings of fact and conclusions of law have been made by the court, a decision on the constitutional question is necessary to the rendition of final judgment." This Court has held that "it would be not only improper to decide the constitutional question sought to be presented on the brief and the reserved questions, but that this court is without jurisdiction to do so until it shall plainly appear that such decision is necessary to the disposition" of the case. *State v. Kelley*, 17 Wyo. 335, 344, 98 P. 886, 889 (Wyo.1909). Because the juvenile court never looked to its own authority or alternative resources available to it for its disposition of these students, the constitutional question is not appropriately before this Court for review.

[¶ 35] Even if this Court were to accept the reserved question for review, I do not agree that this Court has the facts available to it to adequately analyze the reserved question. No adversarial proceedings were held below by which the legal and factual issues relevant to the reserved constitutional question were framed, argued and decided. The School District was not a party to the juvenile court actions when the juvenile court issued its respective orders. When the School District did intervene, it did not request a rehearing before the juvenile court. The School District simply requested the juvenile court reserve a constitutional question to this Court, which was done.

[¶ 36] The juvenile court thus was not presented with the legal and factual arguments from the School District. Because the issue was not properly joined and argued below, the findings of fact and conclusions of law of the juvenile court are incomplete. There are no findings regarding a compelling state interest or narrowly tailored resolutions. The legal arguments presented by the School District in its brief upon review were never considered by the juvenile court. Factually, after intervention the School District submitted several affidavits containing factual assertions that it deems pertinent to the determination of the reserved question, yet these facts have never been examined by the juvenile court, either for accuracy or for applicability. The juvenile court had no information regarding the impact of the lack of education to expelled students on the expelled students, the main student body, the

This Court again stressed the propriety of juvenile court flexibility in ordering services and payment for services in *In re DCP*. The *DCP* Court determined that DFS could be ordered to pay for an out of state placement of a child subject to a juvenile delinquency petition. The Court determined that, although specific statutes regarding requirements for out-of-state placements had not been strictly complied with, substantial adherence to the placement statutes was adequate because there were overriding interests to strict compliance. "In this case, we conclude there was a clear indication that the out-of-state placement effectuated the protection of public safety and provided for the care, protection, and mental and physical development of DCP. Wyo. Stat. Ann. § 14–6–201(c)(ii), (iii) (LexisNexis 2001)." *DCP*, ¶ 19.

Thus, in the instant case, whether or not the School District is required by the Wyoming Constitution to provide lawfully expelled students with an alternative education is irrelevant to the question of whether a juvenile court can order this School District to provide an alternative education to RM and BC. Even should we answer the constitutional question in the negative, the Juvenile Court arguably possesses other authority supporting such an order. The Juvenile Justice Act, at issue in this case, contains the same grant of flexible power to the juvenile court as the statute in *In Re NG*. The juvenile court can order any party to perform any act the court deems necessary. Wyo. Stat. Ann. § 14–6–203(b)(ii) (LexisNexis 2003). Pursuant to the logic of this Court in *In re DCP*, the overriding factor in a delinquency case is to "effectuate[] the protection of public safety and provide[] for the care, protection, and mental and physical development of" RM and BC. *DCP*, ¶ 19.

This Court is not suggesting that we hereby decide that the juvenile court has the authority to order the School District to provide students with a free alternative and appropriate education. We only hold that the means sought—an answer to a reserved question of constitutional law—will have no dispositive effect in the underlying juvenile court proceedings. First and foremost, the propriety of this juvenile court order must be reviewed within the context of the Juvenile Justice Act.

school districts, the state, or anyone else potentially affected by both the policy and any potential alternatives. Such information is relevant to a determination of the nature of the government interest concerned and the appropriateness of the option chosen by the state to further that government interest.

[¶ 37] Because of the procedural posture of this case, for all practical purposes this Court is being asked to exercise original jurisdiction in this matter. We are being asked to make the initial determination of the facts and the law necessary to the determination of the reserved question. Neither Wyo. Stat. Ann. § 1–13–101 nor W.R.C.P. 52(d) grant this Court jurisdiction to review a constitutional question prior to a full determination of the lower court of all necessary findings of fact and conclusions of law. "It has consistently been the position of this court that even when constitutional questions are reserved, under statutory authority, the court will not consider them until all preliminary matters, including factual questions, are finally disposed of and there is nothing left to do but apply the answer to the constitutional question." *Knudson v. Hilzer,* 551 P.2d 680, 686 (Wyo.1976). *See also State v. Rosachi,* 549 P.2d 318 (Wyo.1976); *Hanchey v. Steighner,* 549 P.2d 1310 (Wyo.1976).

[¶ 38] Finally, I am concerned about deciding a question that is so patently moot. The expulsion of these students ended over a year ago. The principle of mootness applies even to issues of fundamental importance. *See In re SNK,* 2003 WY 141, ¶¶ 22, 23, 78 P.3d 1032, ¶¶ 22, 23 (Wyo.2003) (even though issue presented was important, the issue was not reviewed because of a finding that the issue was moot. "This court has clearly established that it will not make determinations which may be characterized as advisory, and this court will not digress from such a position unless extreme circumstances demand.") Neither side has presented any argument in their respective briefs as to why this Court should not consider the question moot.

[¶ 39] I cannot say that the answer to the reserved constitutional question is necessary in the context of a juvenile court proceeding nor will the answer to the actual question

reserved be anything but advisory at this time. *See In re AJ,* 736 P.2d 721, 723 (Wyo. 1987) ("The disposition of AJ and the efficacy of the order entered by the district court will continue without change regardless of the determination of the issues by this court. The case is moot and will not be considered because the judgment rendered cannot be carried into effect.") Most importantly, the answer to the question of constitutional law reserved would not be dispositive of the question of the authority of the juvenile court to order a public school district to provide expelled students adjudged delinquent with a free and appropriate education. Given the context and the procedural posture of this case, this Court should decline to review the reserved question.